UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

_____

UNITED STATES OF AMERICA,                    No. 13-cr-257 (ADM/LIB)

v.                                           **REPORT AND RECOMMENDATION**

Albert Terrell Ellis,
a/k/a "Alvin Ellis,"

                  Defendant.

_____

This matter came before the undersigned United States Magistrate Judge upon

Defendant's Motion to Dismiss Indictment, [Docket No. 30]; as well as, his Motions to Suppress

Evidence Obtained as a Result of Search and Seizure, [Docket No. 18], and for Suppression of

Evidence, [Docket No. 31] (together, "Motions to Suppress Evidence").[1]  The case has been

referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. §

636(b)(1) and Local Rule 72.1.  The Court held a hearing on February 28, 2014, regarding the

Defendant's motions for discovery,[2] suppression, and dismissal.  For reasons outlined below, the

Court recommends that Defendant's Motion to Dismiss Indictment, [Docket No. 30], and his

Motions to Suppress Evidence, [Docket Nos. 18, 31], be **DENIED**.


I.       **BACKGROUND**

Albert Terrell Ellis ("Defendant") is charged in the present case with one count each of

---

[1] Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 18], was made
on his behalf on December 20, 2013, by his counsel Manvir K. Atwal ("Ms. Atwal").  Subsequently, Ms. Atwal
became aware of a conflict that prohibited her, or the Office of the Federal Defender, from representing Defendant,
and Kurt B. Glaser ("Mr. Glaser") was appointed as counsel for Defendant.  (See Text Only Order [Docket No. 24];
Notice of Appearance [Docket No. 26]).  Mr. Glaser then, on behalf of Defendant, made Defendant's Motion for
Suppression of Evidence.  [Docket No. 31].  Because the initial Motion, [Docket No. 18], was never withdrawn, and
because the two Motions to Suppress Evidence do not differ in substance, for purposes of this Report and
Recommendation the Court addresses them together.

[2] Defendant's discovery motions were the subject of a separate Order.  [Docket No. 35].

(1) being an armed career criminal in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e); (2) being an armed career criminal in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e); (3) possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and (4) use of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).  (Indictment [Docket No. 1] at 1-3).  Defendant was indicted on October 23, 2013, and made the present Motions on December 2, 2013, and on February 24, 2014.  Trial is scheduled before the Hon. Ann D. Montgomery for April 21, 2014.  (Text Only Entry: Trial Notice [Docket No. 28]).

## II.    MOTION TO DISMISS INDICTMENT [Docket No. 30]

Defendant asks this Court to dismiss the Indictment on the grounds that "[t]here was no competent evidence presented to the Grand Jury tying the Defendant to criminal activity."  (Mot. Dismiss Indictment [Docket No. 30], at 1).

### A.  Standard of Review

Defendant's motion to dismiss is made pursuant to Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure, which governs motions alleging sufficiency defects in the indictment. The Eighth Circuit has repeatedly held that:

> An indictment adequately states an offense if: it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution. An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted.

United States v. Hayes, 574 F.3d 460, 472 (8th Cir. 2009) (quoting United States v. Sewell, 513

F.3d 820, 821 (8th Cir. 2008) (quotation omitted)).  "An indictment is normally sufficient if its

language tracks the statutory language."  Sewell, 513 F.3d at 821 (citing Hamling v. United

States, 418 U.S. 87, 117 (1974)).

Similarly, the District of Minnesota has held that, in order to survive a criminal

defendant's Rule 12 motion to dismiss:

> an Indictment must allege that the defendant performed acts which, if proven,
> would constitute a violation of the law under which he has been charged.  See
> United States v. Polychron, 841 F.2d 833, 834 (8th Cir. 1988).  As a result, if the
> acts, that are alleged in the Indictment, do not constitute a criminal offense, then
> the Indictment should be dismissed.  See, e.g., United States v. Coia, 719 F.2d
> 1120, 1123 (11th Cir. 1983), cert. denied, 466 U.S. 973 (1984).  In reviewing the
> sufficiency of an Indictment, or of any of its Counts, we are to determine whether
> the Indictment sufficiently sets forth the elements of the offenses alleged, as to the
> offenses that are said to have occurred, in order to place the defendant on fair
> notice of the charges against him, and to enable him to raise an acquittal, or
> conviction, so as to prevent his double jeopardy for a single offense.  See Hamling
> v. United States, 418 U.S. 87, 117 (1974); United States v. Hall, 20 F.3d 1084,
> 1087 (10th Cir. 1994).

United States v. Hughson, 488 F. Supp. 2d 835, 840 (D. Minn. 2007) (Erickson, C.M.J.), adopted

by 488 F. Supp. 2d 835 (D. Minn. 2007) (Doty, J.).

## B.  Discussion

Initially, the Court observes that Defendant does not argue that the Indictment itself is

insufficient;[3] rather, he argues that *the evidence* presented to the grand jury was insufficient to

support the Indictment.  (Mot. Dismiss Indictment [Docket No. 30]).  In particular, Defendant

advances two arguments why the evidence before the grand jury was insufficient: (1) that no

witness before the grand jury identified Defendant by name in connection with any criminal

conduct, (Id. at 1); and (2) that "[t]he primary government witness . . . lacked the mental

---

[3] Nevertheless, out of an abundance of caution, the Court has reviewed the Indictment and the statutes that Defendant is alleged to have violated.  Upon such review, this Court finds that the Indictment generally tracks the statutory language with regard to each individual Count, and, therefore, that the Indictment itself is sufficient to survive a Rule 12(b)(3)(B) challenge.

3

competence" to testify before the grand jury, (Id. at 2).  In support of these arguments, Defendant

asks the Court to consider evidence outside the four corners of the Indictment in the form of two

exhibits: (1) the docket sheet for a Minnesota state court case concerning guardianship of J.C., a

witness who testified before the grand jury, (Mot. Dismiss, Ex. 1 [Docket No. 30-1]; and (2)

transcripts of the October 23, 2013, grand jury testimony of J.C., and of Nicolas Garlie ("SA

Garlie"), a special agent with the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives,

(Def.'s Ex. 1).[4]

### 1.   The Court is not persuaded that it should now review evidence beyond the four corners of the Indictment.

For more than a century, the U.S. Supreme Court has repeatedly rejected the argument

that a grand jury indictment can be challenged on the basis of the sufficiency of the underlying

evidence.  See United States v. Williams, 504 U.S. 36, 53-55 (1992);[5] see also United States v.

Nelson, 165 F.3d 1180, 1182 (8th Cir. 1999) ("It has long been settled that an indictment is not

open to challenge on the ground that there was inadequate or insufficient evidence before the

grand jury."); United States v. Augustine Med., Inc., No. 03-cr-321(1-8) (ADM/AJB), 2004 U.S.

Dist. LEXIS 1980, at *7 (D. Minn. Feb. 10, 2004) (Montgomery, J.) ("In reviewing a 12(b)

motion to dismiss the indictment, the Court does not entertain an evidentiary inquiry, but rather

accepts the allegations of the Indictment as true" (citing United States v. Ferro, 252 F.3d 964,

968 (8th Cir. 2001) (internal citation omitted))); Hughson, 488 F. Supp. 2d at 841 (citing Hall, 20

F.3d at 1087) (when considering a motion to dismiss an indictment as insufficient, "[o]rdinarily,

---

[4] Defendant offered **Defendant's Exhibit 1** at the February 28, 2014, motions and evidentiary hearing; the Government did not object, and the Court accepted Defendant's Exhibit 1 into evidence.

[5] See also Bank of Nova Scotia v. United States, 487 U.S. 250, 261 (1988) (where defendant makes a "challenge to the reliability or competence of the evidence to the grand jury[,] [w]e have held that an indictment valid on its face is not subject to such a challenge" (citing United States v. Calandra, 414 U.S. 338, 344-45 (1974)); Costello v. United States, 350 U.S. 359, 363 (1956) ("An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits."); Holt v. United States, 218 U.S. 245, 247-48 (1910) (refusing to quash an indictment where incompetent evidence "had been considered along with the rest").

the Court's assessment is limited to the 'four corners' of the Indictment, and the Court should

studiously avoid the consideration of evidence from sources beyond the Indictment"). In the

present case, Defendant asks this Court to engage in just such a disfavored evidentiary inquiry.[6]

In the present case, Defendant asks this Court to rule on the *weight* of the underlying

evidence presented before the grand jury. By his first argument, that Defendant asks that the

Court find that the failure of a particular witness to identify him by name means that the grand

jury was not presented with credible evidence that he had engaged in criminal activity. By his

second argument, Defendant asks that the Court find that all testimony by the witness J.C. should

be stricken because she was at one time under guardianship. Neither of these arguments would

support the Court's consideration of evidence outside the four corners of the Indictment.

      **2.   Even if this Court was to consider the evidence outside the four corners of the Indictment presented by Defendant, that evidence would <u>not</u> be sufficient to undermine the Indictment.**

Out of an abundance of caution, and in the interest of completeness, the Court has

reviewed the evidence outside the four corners of the Indictment that was submitted by

Defendant. Upon review, the Court finds that Defendant's evidence, by itself, would not warrant

dismissal of the Indictment.

Defendant first argues that no witness before the grand jury connected Defendant to any

criminal activity. (Mot. Dismiss Indictment [Docket No. 30], at 1-2). However, the evidence he

presents indicates only that J.C. did not identify Defendant by name, but rather, referred to him

---

[6] Some courts recognize a limited exception "where the underlying facts are essentially undisputed," holding that "'it is permissible and may be desirable . . . for the district court to examine the factual predicate for an indictment to determine whether the elements of the criminal charge can be shown sufficiently for a sustainable case." Hall, 20 F.3d at 1087 (quoting <u>United States v. Brown</u>, 925 F.2d 1301, 1304 (10th Cir. 1991)); <u>Hughson</u>, 488 F. Supp. 2d at 841 (citing <u>Hall</u>). For example, in <u>United States v. Petruk</u>, No. 13-cr-165 (SRN/LIB), the parties stipulated to certain facts in order that this Court could determine, as a matter of law, whether those facts were sufficient to support the indictment of the defendant on a carjacking charge, a question that this Court answered in the affirmative. <u>Petruk</u>, 2013 U.S. Dist. LEXIS 136622 (D. Minn. Sept. 4, 2013) (Brisbois, M.J.), <u>adopted by</u> 2013 U.S. Dist. LEXIS 135547 (D. Minn. Sept. 23, 2013) (Nelson, J.). Such an exception finds no application in the present case for the reasons set forth hereafter.

as "Medicine Man."  (See Def.'s Ex. 1 (tr. of J.C. testimony)).  By itself, the fact that J.C. did not

remember Defendant's proper name, without any other indication of what other evidence was

presented to the grand jury, is not sufficient to warrant dismissal of the Indictment.

Defendant's second argument is that J.C. was not competent to testify.  (Mot. Dismiss

Indictment [Docket No. 30], at 2).  In support of that argument, Defendant submits the docket of

a Minnesota State court case showing that a guardian was appointed for J.C. on February 6,

2006; that her guardian petitioned for discharge on April 19, 2012; and that the State court

terminated the guardianship on March 1, 2013.  (Mot Dismiss, Ex. 1 [Docket No. 30-1]).  On

that basis, Defendant argues generally that, because the witness was at one time under

guardianship, she was not competent to testify before the grand jury.  (Mot. Dismiss Indictment

[Docket No. 30], at 2).

The Court is not persuaded.

Defendant asserts that J.C. was under guardianship "[a]t the time of the events in this

case, *and at the time of her testimony before the grand jury*."  (Mot. Dismiss [Docket No. 30], at

2).  However, as previously noted, the docket sheet submitted by Defendant appears to show

that J.C.'s guardianship was terminated on March 1, 2013, and therefore, that she was not subject

to guardianship when she testified before the grand jury on October 23, 2013.  Additionally, even

if J.C. was still subject to the State court's guardianship order when she testified, and even if that

alone was sufficient to render *her testimony* a nullity, this Court is not persuaded that striking

J.C.'s testimony would warrant dismissing the Indictment, particularly when the Court is

required to consider that question without knowing what other evidence was presented to the

grand jury.

As previously noted, Defendant's arguments are, at their core, challenges to the ultimate *weight* of the Government's evidence. Consequently, "[t]hese are factual arguments for the jury." United States v. Hunter, No. 12-cr-185(3) (ADM/FLN), 2013 U.S. Dist. LEXIS 21522, at *4 (D. Minn. Feb. 14, 2013) (Montgomery, J.) (denying motion to dismiss certain counts of the indictment upon finding "that the superseding indictment is legally sufficient on its face), and at *7 (denying motion "to suppress all Counts that aren't supported by substantial evidence . . . [because] the sufficiency of the evidence against the Defendant is a factual issue for the jury").

### 3.  Summary

The facts alleged within the four corners of the Indictment itself are sufficient to charge the counts alleged therein. Additionally, it would be inappropriate at the present time and in the present case to consider evidence outside the four corners of the indictment; and even if the Court believed it to be appropriate to consider such evidence, the evidence that Defendant has provided is not by itself sufficient to undermine the decision of the grand jury to indict. Consequently, the Court recommends that the Defendant's Motion to Dismiss Indictment, [Docket No. 30], be **DENIED**.

## III.    MOTIONS TO SUPPRESS EVIDENCE [Docket Nos. 18, 31]

First, Defendant asks this Court to suppress any evidence obtained as a result of the search of his vehicle on October 10, 2012, alleging that the search warrant was defective. (Mot. Suppression of Evid. [Docket No. 31], at 2). Second, Defendant asks the Court to suppress evidence obtained pursuant to a pat-down search of his person on October 10, 2012. (Def.'s Mem. [Docket No. 37], at 3-5). Finally, Defendant asks the Court to suppress evidence seized from the basement of J.C.'s apartment, where Defendant was a guest.

**A. Facts**[7]

On September 20, 2012, Duluth Police Investigator Scott R. Williams ("Investigator Williams") was told by a confidential informant (the "CI") that the CI had purchased heroin from an unidentified black man inside the apartment of J.C. in the 500 block of East Sixth Street in Duluth.

Approximately three weeks later, on October 10, 2012, Duluth Police received a disturbance call from J.C.'s mother, who reported that there were persons either at or on their way to J.C.'s apartment to harm J.C. The police dispatched officers,[8] including Investigator Matthew M. McShane ("Investigator McShane"),[9] Officer Rendulich,[10] and Officer Johnson,[11] the apartment to check on the welfare of J.C. The apartment was in an up-down duplex, with a storage area in the basement that appeared to be a common area shared by both apartment units. At the time, Defendant and another woman, A.G., were living with J.C. in J.C.'s apartment.

Officer Rendulich arrived first, as Defendant and A.G. were loading up their belongings into a Ford Expedition.[12] Defendant testified that Officer Rendulich patted him down, then

---

[7] The Facts for this Part are drawn from the following:
- The testimony of Duluth Police Investigator Matthew M. McShane ("Investigator McShane") at the February 28, 2014, motions and evidentiary hearing;
- The testimony of Duluth Police Investigator Scott R. Williams ("Investigator Williams") at the February 28, 2014, motions and evidentiary hearing;
- The testimony of Defendant at the February 28, 2014, motions and evidentiary hearing;
- **Government's Exhibit 1**, which is the search warrant authorizing the search of a blue 2006 GMC Envoy, including the application for said search warrant, the affidavit in support of said application, and the receipt for items seized pursuant to the search; and
- Defendant's Exhibit 1, which is described in Part II.B, and in fn.4, supra.

[8] The testimony was that each of the officers on the scene wore a standard police uniform, including sidearm, but that none of the officers drew his or her sidearm during the incident.

[9] At the time of this incident, Investigator McShane was a patrol officer. At the February 28, 2014, motions and evidentiary hearing, he testified that he had recently been promoted to Investigator. In the interest of consistency, the Court refers to him throughout this Report and Recommendation as "Investigator McShane."

[10] Officer Rendulich's first name does not appear in the record.

[11] Officer Johnson's first name does not appear in the record.

[12] The Court observes that this is not the same vehicle that was subject to the search warrant discussed in Part III.B, infra.

instructed him to remain outside while the Officer Rendulich went inside the apartment.

Investigator McShane testified that when he arrived on the scene, he saw Officer Rendulich and Defendant standing outside in the front yard of the apartment speaking in a casual manner.  At that time, Officer Rendulich went inside, and Investigator McShane remained outside with Defendant.  Defendant testified that, subjectively, he did not feel free to leave. Investigator McShane observed no signs that Defendant was intoxicated.  Defendant advised Investigator McShane that J.C. and A.G. had argued, and that J.C. had told them to leave the apartment.  Investigator McShane and Defendant then went inside the apartment, and Officer Rendulich and J.C. stepped outside the apartment, in order to allow Defendant to continue to remove his and A.G.'s belongings from the apartment.

At some point, Officer Rendulich instructed Investigator McShane via police radio that he should conduct a pat-down search of Defendant.[13]  Investigator McShane testified that he asked Defendant if he would consent to a search of his person, and Defendant both gave verbal consent and raised his arms outstretched at his sides in a physical expression of consent. Investigator McShane then conducted a pat-down search,[14] during which he discovered bundles of cash, which he returned to Defendant's pocket.  Investigator McShane and Defendant then went outside, where they spoke with A.G.  Defendant and A.G. then left the scene.  Investigator McShane testified that his interactions with Defendant were polite and cordial.

Defendant agreed that his interaction with Investigator McShane was polite and cordial; however, he described a slightly different version of the pat-down search.  Defendant testified

---

[13] Investigator McShane testified that he did not know that Officer Rendulich had, before Investigator McShane arrived on the scene, conducted a previous pat-down search of Defendant.  However, he testified that he believed it unlikely that Officer Rendulich would have conducted such a pat-down search himself, and then subsequently instructed Investigator McShane to conduct a second pat-down search.

[14] It was not clear from Investigator McShane's testimony whether this pat-down search took place inside the apartment or outside; however, he implied that it took place while he and Defendant were still inside, and that they again went outside after the pat-down.

that Investigator McShane did not ask, but rather, simply stated that: "I need to pat you down." Defendant further testified that, subjectively, he did not believe he could refuse to allow a police officer to conduct a pat-down search.  However, Defendant acknowledged that the officers allowed him to move about freely, including removing his belongings from the apartment. Additionally, Defendant confirmed Investigator McShane's description that he raised his arms as a sign that he consented to the search, and further testified that he did not object to the search and did not want the incident to escalate.

In the meantime, J.C. told Officer Rendulich that Defendant kept a firearm in the shared basement storage area of the apartment building, and she escorted Officer Rendulich down into the basement, where she showed him ammunition that she said belonged to Defendant.  Officer Rendulich advised Investigator McShane that he found ammunition in the basement. Approximately 15 to 20 minutes later, as Defendant and A.G. were permitted to leave the scene, Investigator McShane went down into the basement in order to seize the ammunition.[15]

J.C. also told the officers that she was a heroin addict and a daily user who obtained heroin from Defendant.  She told Investigator McShane that Defendant retrieved the heroin from a vehicle parked in front of the apartment, and pointed officers to a blue 2006 GMC Envoy bearing Illinois license plates ("Defendant's vehicle" or "the vehicle").  Officer Rendulich looked up the license plate number and found that the vehicle was registered to an Augusta Ellis of Chicago, Illinois.  Investigator McShane then provided that information to Investigator Williams so that Officer Williams could draft an application for a warrant to search the vehicle.

---

[15] Investigator McShane's testimony concerning how he happened to go down into the basement was somewhat inconsistent. Initially, he testified that "had a conversation with [J.C.] prior to" recovering the ammunition. However, when asked to describe that conversation, Investigator McShane described his conversation with J.C. concerning Defendant's vehicle.  Subsequently, during Defendant's cross-examination, Investigator McShane testified that J.C. was not present when he went to retrieve the ammunition, and that it was J.C.'s boyfriend, a Mr. Johnson, who authorized him to go into the basement.

Officers on the scene then called for K-9 officers from the Hermantown Police Department and the St. Louis County Sheriff's Office; upon arrival, those officers ran their trained dogs around the vehicle, and both dogs indicated that they detected controlled substances inside the back of the vehicle.

Investigator Williams took that information and prepared an application for a search warrant authorizing a search of the vehicle.  Although the search warrant itself, at the top of the first page, identifies Investigator Williams as the officer applying for the warrant, it also, at the bottom of the first page, names a Richard W. DeRosier ("Mr. DeRosier"), who is one of Investigator Williams' partners, as the applicant and affiant.  Additionally, on the second page of the search warrant, it states that a Timothy R. Monte ("Mr. Monte"), also one of Investigator Williams' partners, was directed to execute the search warrant.  Investigator Williams testified that these references to Mr. DeRosier and Mr. Monte were unintentional typographical errors left over from previous search warrants that were used as templates when he drafted the present search warrant.

### B.  The Court recommends denying the Motions to Suppress Evidence seized from Defendant's vehicle, because the search warrant authorizing the search and seizure was not defective.

Defendant alleges that the search warrant authorizing the search of his vehicle was defective because it identified two different affiants, Investigator Williams and Mr. DeRosier, and because it was not executed by Mr. Monte, whose name was provided as the person executing the warrant.  (Mot. Suppression of Evid. [Docket No. 31], at 2 ¶ 3).

#### 1.  Standard of Review

The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

11

U.S. Const. amend. IV.  The Eighth Circuit has explained that "[a]n affidavit for a search warrant need only show facts sufficient to support a finding of probable cause."  United States v. Parker, 836 F.2d 1080, 1083 (8th Cir. 1987).  "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)).  "The existence of probable cause depends on whether, in the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (quoting United States v. Murphy, 69 F.3d 237, 240 (8th Cir. 1995) (quoting, in turn, Gates, 462 U.S. at 238)).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach."  United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'"  United States v. Wiley, No. 09-cr-239 (JRT/FLN), 2009 U.S. Dist. LEXIS 116899, at *6 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting Solomon, 432 F.3d at 827) (alterations in original).  "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'"  United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)).  Nevertheless, "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'"  Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)).  "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . .

12

[concluding]' that probable cause existed." Gates, 462 U.S. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

**2. Discussion**

In the present case, Defendant does not allege that the warrant was unsupported by evidence establishing probable cause; rather, he argues that the warrant is technically deficient on its face because it erroneously names both Investigator Williams and Mr. DeRosier as applicants/affiants, and because it erroneously directs Mr. Monte to execute the search. The Court is not persuaded.

Investigator Williams testified that Mr. DeRosier's and Mr. Monte's names remained on the warrant form as the result of a mere clerical error, in particular, because Investigator Williams, when working from an old form as a template simply neglected to replace their names with his own. The Eighth Circuit has repeatedly held that such a typographical clerical error "does not affect the validity of [a] warrant," United States v. Henderson, 471 F.3d 935, 937 (8th Cir. 2006), applying that rule in a variety of contexts.[16]  Although none of these cases specifically address the question of a search warrant that names multiple affiants, or that incorrectly designates the person who is to execute the warrant, this Court concludes that, given the weight of Eighth Circuit precedent generally addressing the question of mere clerical errors in search warrants, the errors manifested on the search warrant in the present case do not affect the validity of the warrant.

Because the clerical errors on the search warrant were not sufficient to affect the validity

---

[16] United States v. Hamilton, 591 F.3d 1017, 1020-21, 1029-30 (8th Cir. 2010) (officer's failure to lis items to be seized on the warrant itself, when included in his affidavit, did not affect validity of the warrant); United States v. Hudspeth, 525 F.3d 667, 675 n.3 (8th Cir. 2008) (affidavit providing incorrect last name of defendant's employee did not affect validity of the warrant); Henderson, 471 F.3d at 937 (judge's failure to sign the jurat verifying that the officer swore that the information in the application was true did not affect validity of the warrant); United States v. White, 356 F.3d 865, 869 (8th Cir. 2004) (erroneous date on the search warrant did not affect the validity of the warrant); United States v. Thomas, 263 F.3d 805, 809 (8th Cir. 2001) (incorrect address on search warrant did not affect validity of the warrant where authorities had the correct address under surveillance).

of the warrant, with regard to the search of Defendant's vehicle, the Court recommends that

Defendant's Motions to Suppress Evidence, [Docket Nos. 18, 31], be **DENIED**.

> **C. The Court recommends denying the Motions to Suppress Evidence obtained as a result of the pat-down search of Defendant on the night of October 10, 2012, because Defendant voluntarily consented to the search.**

Defendant argues that what he calls the first pat-down search, allegedly conducted by

Officer Rendulich, was conducted without reasonable suspicion that Defendant was, or was

about to be, involved in criminal activity.  (Mem. Supp. Mots. Suppress Evid. [Docket No. 37],

at 3-4).  In the alternative, Defendant argues that his consent to the second pat-down search

conducted by Investigator McShane was not voluntary.  (Id. at 4-5).[17]

> **1. The first pat-down search by Officer Rendulich**

As previously noted, Defendant testified that he was first subjected to a pat-down search

by Officer Rendulich before Investigator McShane arrived at the scene.  Officer Rendulich did

not testify.  However, Investigator McShane testified that at the time he did not believe that

Officer Rendulich had conducted a pat-down search of Defendant.[18]

The Court finds that Defendant's version of events on the record now before the Court is

not credible.  Investigator McShane specifically testified that Officer Rendulich did not mention

any prior pat-down search of Defendant when he told Investigator McShane to conduct such a

search.  The Court finds it unlikely that Officer Rendulich would have conducted his own pat-

---

[17] The Court observes that the evidence concerning the manner of Defendant's consent is somewhat mixed. Investigator McShane testified that Defendant gave a verbal indication of his consent, although Investigator McShane could not remember the precise wording, and that Defendant also indicated his consent by raising his arms, outstretched away from his body.  Defendant testified that he did not give any verbal consent, but confirmed that he raised his arms away from his body, and testified that the purpose for doing so was to signal his willingness to be searched.

In his Memorandum in Support of his Motions to Suppress Evidence, [Docket No. 37], Defendant argues only that his consent to the pat-down search was not voluntary; he does not argue that he did not, in fact, consent. Nonetheless, the Court observes that the Eighth Circuit has held that an officer may reasonably infer consent on the basis of non-verbal gestures, such as the one made by Defendant in the present case.  United States v. Welerford, 356 F.3d 932, 933-34 (8th Cir. 2004).

[18] See fn.13, supra.

down search of Defendant, and then only minutes later have ordered Investigator McShane to

conduct a second pat-down search, particularly when, as Defendant testified, the first pat-down

search turned up no weapons or illegal drugs.  Therefore, the Court only considers Defendant's

Motions to Suppress Evidence in regard to the pat-down search conducted by Investigator

McShane.[19]

### 2.  The second pat-down search by Investigator McShane

#### a.  Standard of Review

As previously noted, the Fourth Amendment guarantees "the right of people to be secure

in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.

However, "[w]hile the Fourth Amendment does not permit warrantless searches, law

enforcement may conduct such a search if they obtain . . . voluntary consent.'"  United States v.

Dunning, 666 F.3d 1158, 1165 (8th Cir. 2012) (quoting United States v. Quintero, 648 F.3d 660,

667 (8th Cir. 2011)).[20]  The burden of proving voluntary consent falls on the government.  Id.

In determining whether consent was voluntary, a court looks to the totality of the

circumstances, including consideration of the following factors:

(1) the individual's age and mental ability; (2) whether the individual was
intoxicated or under the influence of drugs; (3) whether the individual was

---

[19] The Court is somewhat perplexed by Defendant's attempt to suppress this alleged first pat-down search by Officer Rendulich, which—even if it did happen—according to Defendant's own testimony did not result in the discovery of any evidence.

Defendant appears to argue that Investigator McShane had no reasonable suspicion to conduct his pat-down search because the first pat-down search did not turn up any evidence.  (Mem. Supp. Mots. Suppress Evid. [Docket No. 37], at 4).  However, as the forthcoming analysis shows, Defendant consented to the second pat-down search, see Part III.C.2, infra, and therefore, Investigator McShane did not need reasonable suspicion to conduct a consensual search.  See United States v. Oliver, 550 F.3d 734, 738 (8th Cir. 2008) (following traffic stop, pat-down search of passenger who has been authorized to leave the scene "must be justified by consent **or** by reasonable suspicion of criminal activity" (emphasis added)); United States v. Santos-Garcia, 313 F.3d 1073, 1078 (8th Cir. 2002) (officer did not need reasonable suspicion to search defendant's vehicle after defendant gave his consent); see also United States v. Drayton, 536 U.S. 194, 201 (2002) ("Even when law enforcement officers have no basis for suspecting a particular individual, they may . . . request consent to search luggage—provided they do not induce cooperation by coercive means." (citing Florida v. Bostick, 501 U.S. 429, 434-35 (1991)).

[20] Although Quintero, concerned the search of a hotel room, the Eighth Circuit in Dunning applied the same standard in the search of the defendant's person.

informed of [his] <u>Miranda</u> rights;[21] and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals.  It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

<u>Id.</u> (footnote added).

### b.  Discussion

In the present case, none of the factors identified above weighs in favor of a finding that Defendant's consent to a search of his person was involuntary.  In fact, while some factors are neutral, most of the factors listed above weigh heavily in favor of a finding that his consent was voluntary.

With regard to the four primary factors, Defendant is an adult, and described himself during his testimony at the February 28, 2014, motions and evidentiary hearing as an intelligent man quite capable of expressing himself clearly.  Thus, the first factor weighs in favor of voluntariness.  Additionally, Investigator McShane testified that he saw no signs that Defendant was intoxicated or under the influence of drugs, and Defendant did not contradict this testimony.  Thus, the second factor weighs in favor of voluntariness.  Although there is no evidence that Defendant was advised of his <u>Miranda</u> rights during the course of this incident, he testified that he has had multiple prior encounters with law enforcement—including multiple felony convictions—and that he fully understands his <u>Miranda</u> rights.  Thus, the third factor is neutral, and the fourth factor weighs in favor of a finding of voluntariness.

Additionally, each of the six "environmental" factors identified by the Eighth Circuit

---

[21] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).

weighs in favor of a finding that Defendant's consent was voluntary.  First, Defendant was not physically detained at any point, and therefore, his consent cannot be found to be the product of a lengthy detention.  Second, there is no evidence whatsoever that Investigator McShane threatened, intimidated, or punished Defendant in order to obtain his consent to search.  Third, there is no evidence whatsoever that Investigator McShane used promises or misrepresentations to obtain Defendant's consent to search.  Fourth, Defendant was not in custody at the time that he gave consent; in fact, he had been permitted to freely move in and out of the apartment during this time to remove his and A.G.'s belongings.[22]  Fifth, Defendant gave his consent outdoors, in a public place in full daylight.[23]  Sixth, and finally, Defendant did not object in any way to the search.

Upon the totality of the circumstances, the Court finds that Defendant voluntarily consented to allow Investigator McShane to conduct a pat-down search of his person.  Therefore, with regard to the pat-down search of Defendant's person, the Court recommends that Defendant's Motions to Suppress Evidence, [Docket Nos. 18, 31], be **DENIED**.

---

[22] Defendant appears to argue that he subjectively believed he was in custody, or the functional equivalent of being in custody, because: (1) the police officers arrived with their patrol vehicle lights flashing; (2) he was "compelled to remain at the scene"; and (3) he subjectively believed that "if he refused the search he may be beat up by the police." (Mem. Supp. Mots. Suppress Evid. [Docket No. 37], at 5).

"The test for whether a suspect is on custody is based on an assessment of the objective circumstances from the perspective of a reasonable person in the situation." United States v. Le, No. 04-cr-187 (ADM/AJB), 2005 U.S. Dist. LEXIS 156, at *5-6 (D. Minn. Jan. 5, 2005) (Montgomery, J.) (citing United States v. Axsom, 289 F.3d 496, 500-02 (8th Cir. 2002)).  The Court, therefore, uses an objective standard to determine whether an individual is in custody.

There is no evidence in the record that Defendant was "compelled to remain at the scene."  In fact, during the length of the incident, Defendant was admittedly freely moving in and out of the apartment, removing his and A.G.'s belongings, and placing them in a vehicle.  Moreover, when Defendant had finished removing their belongings from the apartment, and while the officers were still present, he and A.G. were permitted to leave the scene unimpeded.  Thus, Defendant's subjective belief that he may have been beaten if he had refused to consent to the search is both directly at odds with both his and Investigator McShane's testimony that their interactions were generally polite and cordial, and it is also irrelevant to this objective inquiry.

[23] As previously noted, it was unclear from Investigator McShane's testimony whether the pat-down search took place inside the apartment or outdoors.  However, Defendant testified that the search took place outside of the apartment.

**D. The Court recommends denying the Motions to Suppressing Evidence seized from the basement of the apartment, because Defendant had no reasonable expectation of privacy in the common space of the shared basement.**

Defendant raises no objection to Officer Rendulich's visit to the basement with J.C., at which time Officer Rendulich first observed ammunition alleged to belong to Defendant. However, Defendant argues that Investigator McShane did not have J.C.'s consent for his subsequent trip to the basement to seize said ammunition, and that J.C.'s boyfriend, Mr. Johnson, had no authority to consent to such a search and seizure. (Def.'s Mem. Supp. Mots. Suppress Evid. [Docket No. 37], at 7-10).

**1. Standard of Review**

As previously noted, the Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. However, to challenge the lawfulness of a search under the Fourth Amendment, a defendant must first demonstrate that he had a reasonable expectation of privacy. Rakas v. Illinois, 439 U.S. 128, 143 (1978) ("[C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."). "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area or item searched." United States v. Stallings, 28 F.3d 58, 60 (8th Cir. 1994) (quoting United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994)).

**2. Discussion**

In the present case, Defendant has not shown that he had a reasonable expectation of privacy in the common storage area in the basement of a building where he was not even a

resident.  In the alternative, even if he had a reasonable expectation of privacy, Investigator

McShane's seizure of the ammunition from the basement was pursuant to consent to enter the

basement, and it did not violate the Fourth Amendment.

### a.  Reasonable expectation of privacy

In seeking to meet his burden of establishing his reasonable expectation of privacy with

regard to items he may have left in the common storage area in the basement of J.C.'s apartment

building, Defendant merely states that "the basement was not accessible to the general public,"

while acknowledging that "[r]esidents had access to the basement."  (Mem. Supp. Mot. Suppress

Evid. [Docket No. 37], at 6).  However, in assessing whether a person has a reasonable

expectation of privacy, the Eighth Circuit "ha[s] repeatedly held that tenants of multifamily

dwellings have no legitimate expectation of privacy in common or shared areas." United States

v. Mendoza, 281 F.3d 712, 715 (8th Cir. 2002) (citing United States v. McCaster, 193 F.3d 930,

933 (8th Cir. 1999)).  In particular, the Eighth Circuit has held that there is no legitimate

expectation of privacy in a multifamily dwelling's basement storage locker to which other

residents had access.  United States v. McGrane, 746 F.2d 632, 634-35 (8th Cir. 1984).

The Eighth Circuit's opinion in McGrane is particularly instructive.  In that case, an agent

of the Drug Enforcement Administration ("DEA") entered an apartment-building basement

through an unlocked door and, once in the basement, was able to see into a storage locker where

he observed containers of chemicals he suspected were being used to manufacture

methamphetamine.  746 F.2d at 633-34.  The defendant argued that the DEA agent violated his

Fourth Amendment rights by unlawfully entering the basement area and peering into his storage

locker.  Id. at 634.  The Eighth Circuit held that the fact "that [the DEA agent] gained entry to

the basement as an uninvited person does not affect this analysis.  *Our inquiry focuses on* [*the*

*defendant*]*'s expectations of privacy, not the propriety of* [*the DEA agent*]*'s conduct*." Id.

(emphasis added).  Thus, in the present case, as in <u>McGrane</u>, this Court need not reach the

question of whether Investigator McShane obtained a valid consent to enter the common use

basement storage area and seize the ammunition because Defendant had no reasonable

expectation of privacy in that area.

**b.  Consent to search the basement and seize the ammunition**

Even though the Court finds that it need not determine whether Investigator McShane

had consent to re-enter the shared basement common storage area to seize the ammunition, out of

an abundance of caution, the Court now considers that question.  The Court concludes that

Investigator McShane did have consent for the search and seizure conducted in the basement

storage area.

Defendant first argues that although J.C. consented to Officer Rendulich's search of the

basement storage area, she was not present to consent to Investigator McShane's subsequent re-

entry and search approximately 15 to 20 minutes later.

"The standard for measuring the scope of consent under the Fourth Amendment is that of

'objective' reasonableness—what would the typical reasonable person have understood by the

exchange between the officer and the individual?" <u>United States v. Adams</u>, 346 F.3d 1165, 1171

(8th Cir. 2003).  In the present case, the February 28, 2014, motions and evidentiary hearing did

not provide any testimony specifically concerning the scope of J.C.'s consent to the search of the

basement storage area; however, Defendant himself introduced into evidence a transcript of

J.C.'s testimony to the grand jury, where she first testified that Defendant had a gun in the

basement, (Def.'s Ex. 1, at 8:18—10:25), and then testified as follows:

> Q:     Okay. And you said that you took a police officer – did you take a police
> officer to the basement?

> J.C.: Yes, **I said they, I said, "Come with me** before [Defendant and A.G.] leave," and they weren't, you know, listening really what I was saying. So I was trying to show 'em, and they finally came and looked with me.
>
> Q: And were you able to find the gun?
>
> J.C: No.
>
> . . .
>
> Q: Were you able to find any ammunition?
>
> J.C.: Yes.
>
> Q: You had, you found ammunition hidden in the basement, maybe?
>
> J.C.: Yes.

(Def.'s Ex. 1, at 12:22—13:12 (emphasis added)).

Based on J.C.'s testimony to the grand jury concerning her actions and statements to police on October 10, 2012, it would have been reasonable for Officer Rendulich and Investigator McShane to conclude that her consent to search the shared basement common storage area extended not only to Officer Rendulich's search accompanied by J.C., when they first found the ammunition, but also to Investigator McShane's subsequent re-entry into the basement to seize that ammunition. Additionally, there is no evidence whatsoever in the present record to suggest that J.C. withdrew her consent for the officers to search the basement common storage area or to seize ammunition from that area. See United States v. Gray, 369 F.3d 1024, 1026 (8th Cir. 2004) ("an intent to withdraw consent [to search] must be made by unequivocal act or statement" (alteration added)) (citing United States v. Ross, 263 F.3d 844, 846 (8th Cir. 2001)).

Because Defendant had no reasonable expectation of privacy in the shared basement common storage area, and even if he did, because Investigator McShane had a valid consent to search the basement storage area and seize the ammunition, with regard to evidence seized from the shared basement common storage area, the Court recommends that Defendant's Motions to Suppress Evidence, [Docket Nos. 18, 31], be **DENIED**.

IV.     CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY RECOMMENDED**:

1.  That Defendant's Motion to Dismiss Indictment, [Docket No. 30], be **DENIED**, as

    set forth above; and

2.  That Defendant's Motion to Suppress Evidence Obtained as a Result of Search and

    Seizure, [Docket No. 18], and his Motion for Suppression of Evidence, [Docket No.

    31], be **DENIED**, as set forth above.

Dated: March 17, 2014                                   s/Leo I. Brisbois_____
                                                        LEO I. BRISBOIS
                                                        United States Magistrate Judge


**N O T I C E**

During the February 28, 2014, motions and evidentiary hearing, the parties asked for, and the Court granted them, additional time to brief the motions addressed in this Report and Recommendation.  Consequently, and in light of the pending trial date of April 21, 2014, the Court now finds it must reduce the time that the parties are allowed to file, and to respond to, objections to this Report and Recommendation.

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by March 24, 2014**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection.  A party may respond to the objections within **seven (7) days** of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.